**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

SHEILA HELMERT, WILMA BROWN, and                           PLAINTIFFS
LORI WEST, individually and on behalf of all others
similarly situated

v.                                   No. 4:08CV00342 JLH

BUTTERBALL, LLC                                              DEFENDANT

<u>**OPINION AND ORDER**</u>

This is a collective action brought by Sheila Helmert, Wilma Brown, and Lori West, on

behalf of themselves and others similarly situated, against their former employer, Butterball, LLC,

under the Fair Labor Standards Act ("FLSA").  The plaintiffs have filed a motion to compel pursuant

to Federal Rule of Civil Procedure 37(a) in which they assert that the defendant's response to their

first set of requests for production of documents is inadequate because the defendant has refused to

conduct a meaningful search of its electronically stored information ("ESI").  Butterball has

responded and argues that, while it agrees that the plaintiffs are entitled to more documents than

those it has received thus far, the scope of the plaintiffs' request is much too broad.  Butterball also

argues that, because of the burdensome nature of the discovery, cost should be shifted to the

plaintiffs.  For the following reasons, the plaintiffs' motion to compel is granted in part and denied

in part.

**I.**

On April 18, 2008, the plaintiffs commenced this against Butterball, their former employer,

for alleged violations of the FLSA and Arkansas law.  The complaint alleges that the plaintiffs and

other hourly production employees at its Huntsville, Ozark, and Jonesboro plants were not fully

compensated for time spent donning, doffing, and sanitizing protective gear and equipment.  (Am.

Compl. ¶ 19.)  The plaintiffs filed a motion for collective action under the FLSA and for class certification under Federal Rule of Civil Procedure 23.  On December 15, 2009, the Court granted the plaintiffs' motion for collective action and denied their motion for class certification.  Pursuant to the Court's scheduling order, discovery has been divided into two phases.  Phase 1 discovery pertained to certification issues only and took place prior to the plaintiffs' motion for collective action and class certification.  Phase 2 "merits" discovery began on December 15, 2009, when this Court granted the plaintiffs' motion for collective action.

On September 29, 2008, the plaintiffs served their first set of requests for production of documents.  Included in this set was a request for "[a]ll documents, correspondence, e-mail, or other written materials related to employee donning and doffing of personal protective equipment, safety equipment, tools, uniforms, and/or other gear or clothing."  (Pls.' Ex. Y at 6.)  The plaintiffs also requested "[a]ll documents evidencing communications amongst and between employees, management or otherwise, that concern payment of wages for time spent donning, doffing, walking, sanitizing, or waiting in any production facility" and "[a]ll documents related to Butterball's payroll procedures" and "punch-clock procedures."  (*Id.* at 4-5.)  In response to the plaintiffs' request, Butterball produced 800 documents.  In addition, it conducted a search for the phrase "donning and doffing" in the active and archived email boxes of 22 Butterball custodians—every custodian who had received a litigation hold notice in May 2007.[1]  Butterball did not limit the search by date.  (Pls.'

---

[1]The custodians included (1) Joe Adrian, (2) Randy Black, (3) Michael Bliss, (4) Bill Folk, (5) Terry Harper, (6) Carey Howerton, (7) Carey Humphrey, (8) Karen Ingram, (9) John Lenahan, (10) Gary Lenaghan, (11) Andrew Lekwa, (12) Deborah Lisella, (13) Leigh Ann Mendoza, (14) Joe Nalley, (15) Phil Paulk, (16) Robert Salicido, (17) Yvonne Sanderson, (18) Tim Scanlan, (19) Craig Schweiger, (20) Brenda Smith, (21) Tammi Smith, and (22) Ron Wells. (Pls.' Ex. A.)

Ex. A.)  Based on that search, Butterball produced 87 emails.  Butterball asked the plaintiffs to submit a list of other search terms or custodians if they did not feel that Butterball's search was sufficient. (*Id.*)  However, Butterball maintained that "it has produced all e-mail communications relevant to the subject matter of these [sic] lawsuit." (*Id.*)  The plaintiffs note that, on March 9, 2010, they received three additional email communications relevant to their case that should have been retrieved in the initial search.  (Pls.' Ex. N. at BB/Helmert 008419, 008421, 008423.)

On April 17, 2009, the plaintiffs requested that Butterball conduct another ESI search with an expanded list of eleven additional custodians and 52 additional search terms.  (Pls.' Ex. B.)  The plaintiffs also asked Butterball about its email retention policies, server locations, and email backup and storage policies.  (*Id.*)  On April 24, 2009, Butterball responded with a letter explaining that it would not "conduct additional e-discovery of either the additional custodians or search terms outlined in your April 17 letter" because it believed the requests were unduly burdensome and "would not lead to the discovery of any additional admissible evidence."  (Pls.' Ex. C.)  In an effort to demonstrate how burdensome such a search would be, Butterball conducted the proposed search on the emails of Gary Lenaghan, the individual Butterball believed was "most likely to have additional discoverable emails."  (*Id.*)  The search terms returned a total of 11,713 emails from Lenaghan's active and archived folders.  (Def.'s Br. at 9.)  Butterball reported, "It took 2.5 hours simply to retrieve the emails, almost none of which related to donning and doffing.  Those that did relate to donning and doffing have already been produced."  (Pls.' Ex. C.)  Again, Butterball reiterated that it had already "conducted a complete, diligent search of e-mails designed to discover all relevant, admissible communications."  (*Id.*)

After another request by the plaintiffs for additional e-discovery (Pls.' Ex. D), Butterball agreed to "work with Plaintiffs on narrowing the list of additional custodians and search terms" under two conditions: the plaintiffs allow Butterball two months to conduct the search, and the plaintiffs refuse to ask for any further electronic discovery.[2] (Pls.' Ex. E.) Although the parties held a meet-and-confer conference on June 5, 2009, it appears that nothing was resolved: the plaintiffs would not agree to Butterball's two conditions for conducting additional searches, and Butterball would not perform the searches without the conditions being agreed upon. (Pls.' Exs. F & G.)

Counsel for the parties engaged in two more meet-and-confer conferences on January 4, 2010, and January 12, 2010. On January 27, 2010, Butterball submitted a proposal to the plaintiffs, offering to search the email folders and inboxes of 29 custodians[3] for the 12 previously proposed terms from May 10, 2007, to the present. (Pls.' Ex. K.) The plaintiffs responded that they would not agree to a discovery plan that allowed Butterball to fulfill its discovery obligations by conducting a single ESI search for the remainder of the case. (Pls.' Ex. L.) Plaintiffs' counsel proposed an ESI search of 43 custodians for 70 separate terms dating back to 2000. (*Id.*) In addition to Butterball

---

[2]Specifically, Butterball agreed to search the email folders and inboxes of the 22 custodians already named, as well as five additional custodians: Keith Shoemaker (limited to the time period after he began working for Butterball in 2008), Miguel Ramirez, Walter Davis, Frank Koekkoek, and Linda Thomas. Butterball agreed to search for the terms: "time-stud," "time-motion stud!," "Alvarez," "de minimis," "gang time," "line time," "plug time," "preliminary activit!," "postliminary activit!," "Fair Labor Standards Act," "FLSA," and "don! and doff!" (Pls.' Ex. E.)

[3]Butterball agreed to search the active and archived emails of (1) Randy Black, (2) Michael Bliss, (3) Walter Davis, (4) Kerry Doughty, (5) Bill Folk, (6) Terry Harper, (7) Carey Howerton, (8) Carey Humphrey, (9) Karen Ingram, (10) Alice Johnson, (11) Ed Kascuta, (12) Frank Koekkoek, (13) Gary Lenaghan, (14) Andrew Lekwa, (15) Deborah Lisella, (16) Leigh Ann Mendoza, (17) Joe Nalley, (18) Walter Pelletier, (19) James Ponce de Leon, (20) Yvonne Sanderson, (21) Tim Scanlan, (22) Paul Sears, (23) Keith Shoemaker, (24) Brenda Smith, (25) Tammi Smith, (26) Dennis Stover, (27) Steve Swan, (28) Gloria Thompson, and (29) Ron Wells. (Pls.' Ex. K.)

email accounts, the plaintiffs proposed searching all sources of ESI, including computer hard drives, databases, backup tapes, and non-Butterball email accounts to which Butterball had access. (*Id.*) Butterball responded that it would only be able to search active and archived email back to May 10, 2007, the date the litigation hold notice was issued, and it objected to the plaintiffs' proposed terms and custodians. (Pls.' Ex. M.) Butterball also opined that its email system would not allow for searches for terms within the same sentence or within a certain number of words as another term. (*Id.*) On March 11, 2010, the plaintiffs filed this motion to compel discovery of ESI.

## II.

Here, the plaintiffs move to compel the production of discoverable information resulting from a search of 70 separate terms from all possible sources of ESI belonging to 43 Butterball custodians dating back to 2000. The plaintiffs claim that such a search will uncover nonprivileged information relevant to the plaintiffs' claims. In its response, Butterball consents to search the active and archived email folders of all but 10 of the 43 custodians identified by the plaintiffs for the 12 terms it has already proposed dating back to November 8, 2005. (Def.'s Br. at 4.) Butterball argues that a search of ESI beyond that which the defendant proposes will be unreasonably duplicative of the information that has already been provided to the plaintiffs and will impose a significant burden and expense upon Butterball. Butterball also contends that some of the ESI that the plaintiffs want searched is not reasonably accessible and that the plaintiffs have failed to meet their burden of showing good cause for conducting a search of that information.

Federal Rule of Civil Procedure 26(b) governs the scope and limits of the discovery of ESI. As an initial matter, parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. Fed. R. Civ. P. 26(b)(1). "Relevancy is broadly construed, and a

request for discovery should be considered relevant if there is 'any possibility' that the information sought may be relevant to the claim or defense of any party.  A request for discovery should be allowed 'unless it is clear that the information sought can have no possible bearing' on the claim or defense of a party." *Moses v. Halstead*, 236 F.R.D. 667, 671 (D. Kan. 2006).  The materials need not be admissible at the trial if they are reasonably calculated to lead to the discovery of admissible evidence.  Fed. R. Civ. P. 26(b)(1).  Discovery of relevant, nonprivileged ESI is limited if the party from whom discovery is sought establishes that it is unreasonably cumulative or duplicative or that the burden or expense of the proposed discovery outweighs its likely benefit.  *See* Fed. R. Civ. P. 26(b)(2)(B).  "If the ESI is not reasonably accessible, it is only discoverable upon a showing of good cause by the requesting party, taking into consideration the limitations of Rule 26(b)(2)(C)." *Best Buy Stores, L.P. v. Developers Diversified Realty Corp.*, 247 F.R.D. 567, 569 (D. Minn. 2007); *see also* Fed. R. Civ. P. 26(b)(2)(C).

## A.      Proposed Search Terms

The plaintiffs have divided their proposed search terms into four categories: (1) terms related to donning and doffing cases against Smithfield Foods and its subsidiaries; (2) terms related to Supreme Court and other seminal donning and doffing cases; (3) terms related to individuals, law firms, and industry organizations, and (4) terms related to Butterball's compensation practices.

### 1.      *Terms Related to Donning and Doffing Cases Against Smithfield Foods and Its Subsidiaries*

First, the plaintiffs ask the Court to compel Butterball to search terms and phrases that correspond to the names of named plaintiffs from 17 donning and doffing cases filed against one of

Butterball's owners, Smithfield Foods, Inc., and its operating companies and joint ventures.[4]  They argue that ESI that references any of these cases is "highly relevant to Butterball's alleged 'good faith' compliance with, and non-'willful' violation of, the FLSA."  (Pls.' Br. at 17.)  Under the FLSA, "[a]n award of liquidated damages . . . is mandatory unless the employer can show good faith and reasonable grounds for believing that it was not in violation of the FLSA."  *Braswell v. City of El Dorado, Ark.*, 187 F.3d 954, 957 (8th Cir. 1999); *see* 29 U.S.C. § 216(b) (2006); *Jarrett v. ERC Props., Inc.*, 211 F.3d 1078, 1084 (8th Cir. 2000).  The good faith defense requires the employer to establish "an honest intention to ascertain and follow the dictates of the FLSA."  *Chao v. Barbeque Ventures, LLC*, 547 F.3d 938, 942 (8th Cir. 2008) (quoting *Hultgren v. County of Lancaster, Neb.*, 913 F.2d 498, 509 (8th Cir. 1990)).  Butterball asserts that it acted in good faith in its attempt to follow the FLSA.  (Am. Ans. ¶¶ 20-22, 39, 48-49, 55-56, 60, 62.)  Thus, the plaintiffs allege that they "are entitled to explore what research . . . Butterball may have engaged in (if any) as part of its alleged 'good faith' effort to ascertain the FLSA's requirements." (Pls.' Br. at 18.) Butterball argues that these terms will not reveal relevant information because neither Maxwell Farms, LLC, (51 percent owner of Butterball) nor Smithfield Foods (49 percent owner), who were involved in these cases, are involved in decisionmaking for Butterball.  Even so, whether Butterball decisionmakers were aware of and engaged in correspondence about prior donning and doffing cases—even those involving other companies—is relevant to Butterball's good faith defense.

---

[4]Proposed terms include: (12) "Helmert," (13) "Hudson," (14) "Salazar," (15) "Martinez-Hernandez," (16) "Androy," (17) "Morales," (18) "Morrisroe," (19) "Cowella" within the same sentence as "Johnson," (20) "Saunders," (21) "Bessey," (22) "McNeil," (23) "James" within the same sentence as "Harris," (24) "Horne," (25) "Lee" within the same sentence as "Harris," (26) "Jerry" within the same sentence as "Parker," (27) "Angelina" within the same sentence as "Mitchell," and (28) "Whitley." (Pls.' Ex. A.)

Butterball also contends that the burden of conducting a search with these terms outweighs the benefits. *See* Fed. R. Civ. P. 26(b)(2)(B). Specifically, Butterball suggests that a search of these terms will result in a number of documents and emails through which Butterball will have to comb for privilege, and Butterball attests that it is impossible to search emails for one word within the same sentence as another word, as some of the plaintiffs' search terms require, because Butterball's email system does not have that search capability. Butterball offers no cost estimate, however, to support its assertion that a search for the proposed terms would be overly burdensome. The terms the plaintiffs propose are, in fact, unique names of specific donning and doffing cases, and to the extent that these names are found in emails of Butterball custodians, it is likely that some of them will pertain to donning and doffing. In any discovery request, relevant documents must be combed for privilege, and the defendant offers no evidence as to why this request should be any different. The Court does agree that, to the extent that it is impossible to conduct an electronic search of emails for one term within the same sentence as another term, requiring Butterball to do so would be unduly burdensome. The plaintiffs offer no evidence that Butterball can, in fact, perform such a search electronically. Nor do they offer any alternative method for conducting such a search.[5]

Thus, the Court finds that the plaintiffs' proposed terms relating to prior donning and doffing cases involving Smithfield Foods and its subsidiaries are narrowly tailored to lead to the discovery of relevant information, with the exception of the terms that require Butterball to search for one term "within the same sentence as" another term.

---

[5]They do suggest that Butterball can search for the first term, and then search the document for the second term where the search term requires two or more words in the same document. Even this alternative, however, will not necessarily find words within the same sentence as other words.

> ### 2.    *Terms Related to Supreme Court and Seminal Donning and Doffing Cases*

Likewise, the Court finds that the seven proposed search terms relating to Supreme Court and other seminal donning and doffing cases is likely to lead to the discovery of relevant emails and documents.[6]   Butterball does not deny that such terms may yield relevant information; rather it contends that "whatever emails searches for these terms would yield would already be captured in searches for 'donning and doffing' or 'don* and doff*.' " (Def.'s Br. at 15.)  The Court finds that argument unpersuasive.  It is quite possible, if not likely, that a custodian could refer to the "*Alvarez*" decision in an email, for instance, without ever mentioning the phrase "donning and doffing."   In fact, when Butterball searched Lenaghan's active and archived emails for the term "Alvarez," the search returned 453 emails.  After searching for the phrase "donning and doffing" in the active and archived email boxes of 22 Butterball custodians, Butterball produced only 87 total emails.  Although Butterball did not search all 453 emails to determine which of those emails are discoverable, it is likely that some of the emails contain relevant, nonprivileged information not covered by the "donning and doffing" search.  The Court finds that these search terms are narrowly tailored to lead to the discovery of relevant information.

> ### 3.    *Terms Related to Individuals, Law Firms, and Industry Organizations*

The plaintiffs also propose searching for terms and phrases that correspond to the names of individuals, law firms, and industry organizations documented in relevant ESI and documents that have been produced so far.[7]  However, the plaintiffs offer no indication as to why these particular

---

[6]The proposed terms are: (6) "Alvarez," (7) "Barber Foods," (8) "IBP," (9) "Tum," (10) "Tyson," and (11) "Mountaire Farms."  (Pls.' Ex. A.)

[7]The proposed terms are: (46) "Wylie," (47) "Wimberly" and "Lawson," (48) "Jackson Lewis," (49) "Chicken Council," (50) "Turkey Federation," (51) "Poultry and Egg Association," "Poultry & Egg Association," "Poultry and Egg," "Poultry & Egg," (52) "Poultry Federation,"

terms are likely to lead to the discovery of more relevant information.  (*See* Tatting Aff. ¶ 19.)

Simply because the terms were found in relevant documents and emails does not necessarily mean

that a search of the terms will lead to other relevant documents or emails.  In fact, there are probably

many terms and phrases in the discovered documents a search of which would not lead to the

discovery of other relevant information.  Butterball also points out that, even if a search of these

terms might produce some relevant, nonprivileged information, that information could be obtained

in other ways.  This Court agrees. While a search of terms like "Department of Labor," "Chicken

Council," and "Jackson Lewis" (Butterball's counsel), may lead to the discovery of some relevant

information, any relevant document or email that names the Department of Labor, the National

Chicken Council, or Jackson Lewis is likely to include a word or phrase that is more specific to

donning and doffing than simply the organization or firm name.  To the extent that these terms are

likely to lead to the production of relevant information, that information will merely duplicate

information that could be produced by searching other, more specific terms.

### 4.      *Terms Related to Butterball Compensation Practices*

Finally, the plaintiffs propose searching for terms related to donning and doffing

compensation practices at Butterball.[8]  According to the plaintiffs, some of these terms are designed

---

(53) "Marr," (54) "George" within the same sentence as "Watts," (55) "Pretanik," (56)
"Brandenberger," (57) "Rybolt," (58) "Dorinda" within the same sentence as "Peacock," (59)
"Michael" within the same sentence as "McCann," (60) "Templeton," (61) "Haygood," (62)
"Lisa" within the same sentence as "Dixon," (63) "Joyner," (64) "Randy" or "Randolph" within
the same sentence as "Sullivan," (65) "Roger" within the same sentence as "Miller,"(66)
"thowell@gmcom.net," (67) "Department of Labor," "USDOL," "DOL," "Labor Department,"
(68) "Labor Standards Division," "Division of Labor," "Wage and Hour Bureau," (69)
"ARDOL," "NCDOL," "MODOL," "MODOL," "CODOL," and (70) "Kronos."  (Pls.' Ex. A.)

[8]These terms include: (1) "time" and "study," (2) "time" and "motion," (3) "travel time,"
"walk time," "walking time," (4) "off the clock," (5) "on the clock," (29) "continuous workday,"
"continuous work day," "continuous" within the same sentence as "day" or "work," (30) "back

to unveil discoverable ESI related to expert and non-expert liability analyses concerning potential damage estimates that are commonly conducted by donning and doffing defendants.  Others are designed to capture ESI relevant to Butterball's compensation practices that are being challenged.  Still others are designed to capture ESI relevant to the parties' legal claims and defenses as well as Butterball's knowledge of wage and hour laws.  Butterball argues again that a search of these terms is overly burdensome and will exact "an enormous cost on Butterball."  (Def.'s Br. at 17.)  Yet Butterball offers no evidence of the estimated cost of conducting such a search.  In the sample search of Lenaghan's active and archived emails, the term "back pay" returned 792 emails; the term "Kronos" returned 297 emails.  While some of these emails may not be discoverable, the plaintiffs should have the opportunity to review any relevant, nonprivileged emails that the search uncovers to the extent that Butterball can perform the search.[9]

---

pay," "backpay," "back wage," "backwages," (31) "6 minutes," "six minutes," (32) "2 minutes," "two minutes," (33) "de minimis," "deminimis," "deminimus," "de minimus," (34) "gang time," (35) "line time," (36) "plug time," (37) "Fair Labor Standards Act," "FLSA," (38) "Minimum Wage Act," "Minimum Wage Order," "Wage and Hour Act," "Minimum Wage Law," "wage act," "wage law," "wage regulation," "wage order," "AMWA," "CMWO," "NCWHA," "MMWL," (39) "doff," (40) "D&D," "D & D," "DandD," "D and D," (41) "overtime" and all possible variants, (42) "time and one half," "time and a half," "1.5," and "time" in the same sentence as "half," (43) "time clock," (44) "swipe in," (45) "swipe out," and (70) "Kronos." (Pls.' Ex. A.)

[9]Butterball contends that it cannot search for terms within the same sentence as another term.  Thus, terms that call for searches for words within the same sentence as another term should be excluded.  Butterball also contends that it cannot search for two separate terms within the same document except by conducting a search for one term and then, from the documents containing that term, search for the second term.  Because this process is more tedious than a single-term search, and the search phrases that require searching for two separate terms in the same document are not likely to lead to the discovery of relevant information, the Court will not require Butterball to conduct a search for two separate terms in the same document.

B.      **Proposed Custodians**

The plaintiffs ask the Court to compel Butterball to search the ESI of ten custodians that Butterball does not consent to search.  Those custodians include (1) three owners and executives of Butterball's majority owner Maxwell Farms; (2) five current and former employees at Butterball's Longmont, Colorado, facility; and (3) two other former Butterball employees.

1.      ***The Maxwells***

The plaintiffs contend that a search of ESI belonging to Gordon and Louis Maxwell will lead to the discovery of relevant information.  Specifically, the plaintiffs rely on the deposition testimony of Butterball's corporate designee Karen Ingram, which suggests that Gordon and Louis Maxwell, as part of Butterball's ownership, made the ultimate decision about compensation for time spent donning and doffing. (Pls.' Br. at 24.)  Since Ingram's deposition was taken, both Gordon and Louis Maxwell have been deposed, and both have denied any involvement in Butterball's decisionmaking. (Def.'s Exs. G & H.)  While they concede that they have attended meetings two to three times each year held by Butterball management, they state that they attended the meetings as observers only. (*Id.*)  Thus, even if a search of their emails revealed information pertaining to donning and doffing, such information would not be relevant to any specific claim or defense presented in this case. Therefore, Butterball will not be compelled to conduct those searches and produce those emails.[10]

The plaintiffs also contend that Jim Maxwell should be a subject of discovery because he and Walter Pelletier manage Maxwell Farms and make decisions for Butterball.  (Pls.' Br. at 27.)  In his deposition, Gordon Maxwell stated that Jim Maxwell, Walter Pelletier, Keith Shoemaker, and Jerry

---

[10]Should the plaintiffs in the future find evidence to suggest that a search of Gordon or Louis's ESI would reveal discoverable information, then such a search might be appropriate at that time.

Godwin form Butterball's upper management group and probably made the ultimate decisions concerning whether Butterball should or should not pay employees for donning and doffing activities. (Pls.' Ex. DD at 113:25-114:11.) Butterball points out that Gordon Maxwell did not know for sure whether or not donning-and-doffing-related decisions were decisions for upper management. (*Id.* at 114:21-23.) Furthermore, Butterball states that Jim Maxwell is not a Butterball employee and does not have a Butterball email account and that any email exchanges in which he was included would be discoverable by searching the emails of Walter Pelletier (Maxwell Farris's representative to Butterball who was involved in approving Butterball's donning and doffing decisions) and Keith Shoemaker (Butterball's CEO). The Court agrees that any emails to which Jim Maxwell was a party almost surely would have included Pelletier, Shoemaker, or others whose emails will be searched, so a search of Jim Maxwell's emails would be duplicative. Butterball will not be required to search Jim Maxwell's emails.

### 2. *Longmont Employees*

Butterball contends that searching the ESI of Rich Chosich, Robert Salcido, John Quarles, Shawn McFarland, and Miguel Ramirez, is not reasonably calculated to lead to the discovery of admissible evidence because each of these individuals are employees at Butterball's Longmont, Colorado, facility, which is not involved in this lawsuit. Butterball points out that, unlike the Arkansas facilities, the Longmont facility has never paid donning and doffing time, and donning and doffing is a subject of a mandatory collective bargaining between the company and the United Food and Commercial Workers Union. According to the plaintiffs, Butterball's argument "ignores the more pertinent fact that these individuals may have been the Butterball employees most knowledgeable of the legal requirements of the FLSA as it relates to donning and doffing

compensation." (Pls.' Br. at 29.) Thus, a search of their emails is likely to lead to the discovery of evidence related to Butterball's knowledge of the FLSA and, thereby, its good faith defense. The Longmont employees may very well have ESI containing relevant, nonprivileged information.

Butterball next contends that, even if a search of their ESI may lead to discoverable information, it should not be required to search the ESI of Rich Chosich, Robert Salcido, John Quarles, or Shawn McFarland because their emails are only available on backup tapes, and the burden of searching those tapes outweighs any possible discovery benefits. The Court will address the plaintiffs' proposed sources of ESI in Subsection C below. Here, it is sufficient to say that ESI belonging to the above-named employees is likely to lead to the discovery of relevant information.

### 3. *Two Former Butterball Employees*

The plaintiffs also seek to discover the ESI of two other former employees: Dan Blackshear, the former President of Sales, Marketing, Research and Development at Butterball; and Joe Adrian, the former Human Resources Manager at Butterball's Huntsville plant. Butterball does not deny that these former employees are legitimate sources of discovery. Rather, it contends that, because their emails are only available on backup tapes, their emails are not readily accessible and the burden of searching their emails outweighs the benefits of discovery. The Court will address this issue below.

### C.    Proposed Sources of ESI in Addition to Active and Archived Butterball Emails

The plaintiffs have asked Butterball to search not only active and archived emails stored in Butterball email accounts, but also backup tapes where emails of former employees are kept, work laptops and hard drives of Butterball employees, and, where appropriate, outside email accounts. Butterball argues that a search of these additional sources of ESI would impose an undue hardship and would merely duplicate the search results of active and archived emails. This Court is not

persuaded that a search of laptop or computer hard drives would duplicate the email search.  A computer's hard drive could contain a number of relevant documents that were never sent by email. Likewise, this Court is unpersuaded that exploring Butterball's own hard drives would impose an unreasonable burden on Butterball, and Butterball makes no effort to explain why these sources would not be reasonably accessible.

Butterball does, however, make a showing that its backup tapes are not reasonably accessible. Reasonable accessibility is best understood in terms of whether the ESI "is kept in an accessible or inaccessible format (a distinction that corresponds closely to the expense of production)." *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 318 (S.D.N.Y. 2003).  This distinction largely depends on the media on which the ESI is stored.  *Id.*  Requested data maintained on backup tapes is typically classified as inaccessible.  *Id.* at 319-20.  Here, "[t]o recover the emails stored on backup tapes to the point of being able to search them, a Novell server must be built, GroupWise installed, and then the entire post office restored, a process which takes several days."  (Def.'s Br. at 9-10.)  The hardware needed to restore a post office would cost approximately $10,000.  (Def.'s Ex. D at 127:19-24.)  In addition to this cost would be "the time [for] the network team to construct a Netware server, install the group wise software, find the appropriate backup tape and restore that tape."  (*Id.* at 168:17-169:11.)  Only then could Butterball search the email accounts of former employees for particular terms.  Based on these facts, the backup tapes are in fact inaccessible.

The plaintiffs argue that, even if the backup tapes are inaccessible, they have good cause for obtaining discovery from the tapes.  The Federal Rules of Civil Procedure advisory committee's notes list seven factors to inform the "good cause" inquiry: (1) the specificity of the discovery request; (2) the quantity of information available from other and more easily accessed sources; (3)

the failure to produce relevant information that seems likely to have existed but is no longer available on more easily accessed sources; (4) the likelihood of finding relevant responsive information that cannot be obtained from other, more easily accessed sources; (5) predictions as to the importance and usefulness of the further information; (6) the importance of the issues at stake in the litigation; and (7) the parties' resources. Fed. R. Civ. P. 26(b)(2) advisory committee's notes (2006 Amendment). Ultimately, "[t]he decision whether to require a responding party to search for and produce information that is not reasonably accessible depends not only on the burdens and costs of doing so, but also on whether those burdens and costs can be justified in the circumstances of the case." *Id.* "Whether good cause exists depends upon a weighing of the relevant considerations already identified." *Major Tours, Inc. v. Colorel*, Civil No. 05-3091(JBS/JS), 2009 WL 3446761, at *3 (D.N.J. Oct. 20, 2009).

As to the first factor, the plaintiffs have specifically identified the terms for which they would like to search, and their request is reasonably specific. *See id.* The second factor weighs in favor of the defendant. In response to the plaintiffs first request for documents, Butterball produced nearly 800 documents. Throughout the course of discovery, the plaintiffs will take a number of depositions and have access to countless documents and emails that are more readily accessible than the backup tapes. Third, this Court finds no evidence of spoliation. "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Zubulake v. UBS Warburg, LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (quoting *Fujitsu Ltd. v. Fed'l Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)). The plaintiffs argue that, because Butterball has documents in its privilege log dating back to 1999, it has anticipated litigation since then and should have kept all of its emails in

an accessible format rather than transferring them to backup tapes. (*See* Pls.' Ex. H.) Butterball denies that assertion and points out that most of the documents on its privilege log do not belong to Butterball but to ConAgra, its predecessor. (Def.'s Br. at 10.) Even if ConAgra may have anticipated litigation as early as 1999, there is no evidence that Butterball or its employees had an obligation to preserve emails in a format other than as backup tapes. The fourth and fifth factors also weigh in favor of Butterball. Even though the backup tapes contain emails of persons who no longer work for Butterball, the plaintiffs offer no evidence to suggest that they will be unable to find or depose those persons or obtain the relevant information in another way. Furthermore, the plaintiffs cannot predict with any certainty whether a search of the backup tapes will yield relevant, useful information or how much information will be produced. The sixth and seventh factors weigh in favor of the plaintiffs: important issues of good faith are at stake here, and Butterball, as the largest producer of turkey products in the United States (Pls.' Ex. O), has the resources available to conduct a search of its backup tapes.

A court should not treat the "good cause" factors as a checklist; rather, the factors should be weighed by importance. *Zubulake*, 217 F.R.D. at 322. Here, the Court finds it most significant that the plaintiffs have no idea what, if any, discoverable information may be obtained by rebuilding a server post office and searching the emails of the above-listed persons that are stored on the backup tapes. Thus, the Court concludes that the slim likelihood that new and relevant information may be discovered does not outweigh the substantial burden and expense required to retrieve the information from the backup tapes. *See Major Tours, Inc.*, 2009 WL 3446761, at *4 (drawing the same conclusion under similar circumstances).

Finally, the plaintiffs seek to compel Butterball to search "non-Butterball ESI sources" in its possession and control, including the personal and professional email accounts of Jim Maxwell, Walter Pelletier, and Keith Shoemaker, who were not on Butterball's email system until mid-2008. (Pls.' Ex. C.)  The plaintiffs point out that these custodians are part of the upper management group of Butterball and would make ultimate decisions concerning whether Butterball should pay or not pay for donning and doffing activities.  They also opine that Butterball has failed adequately to describe the ESI over which it and its custodians have possession and control.  Although Butterball cursorily mentions that it does not have access to personal email accounts, it does not explain why these accounts are not reasonably accessible or unlikely to lead to the disclosure of relevant information.  Active, online data is generally considered accessible. *Zubulake*, 217 F.R.D. at 318-20. Thus, in addition to conducting a search of active and archived emails in Butterball accounts, the defendant should also search hard drives, laptops, and the personal email accounts of Walter Pelletier and Keith Shoemaker[11] for the search terms described above.  To the extent that it has not yet done so, Butterball also should disclose all of the sources of ESI within its possession and control.

## D.     Proposed Time Period to Search

The plaintiffs seek to compel Butterball to search ESI obtained since 2000.  Butterball argues that a search for information prior to November 8, 2005, when the Supreme Court decided *IBP, Inc. v. Alvarez*, 546 U.S. 21, 126 S. Ct. 514, 163 L. Ed. 2d 288 (2005), is not likely to lead to the discovery of relevant, nonprivileged information because (a) any electronic communications regarding donning and doffing would have occurred after the *Alvarez* decision and (b) Butterball did

---

[11]The Court has stated above that Butterball will not be ordered to search Jim Maxwell's emails.

not acquire the facilities at issue in this lawsuit until October 2, 2006.  The plaintiffs contend that

they need ESI dating back to 2000 to determine whether Butterball was a part of any donning and

doffing discussions, and in particular, a United States Department of Labor survey or investigation

into FLSA compliance with respect to payment for donning and doffing activities.

The Court is not persuaded that a search of ESI prior to 2005 will result in the discovery of

information relevant to a claim or defense that has been presented.  Ultimately, the plaintiffs seek

to determine whether or not Butterball has a good faith or non-willful defense under the FLSA, and

for that reason, it is important to discover what Butterball, its employees, and its management knew

or believed about donning-and-doffing-related compensation.  The plaintiffs suggest that, if

Butterball participated in the USDOL's surveys and investigations into FLSA compliance, then it

might have believed that it was in violation of the FLSA and lack a good faith defense.  The

plaintiffs offer no evidence at this point, however, that Butterball participated in a USDOL survey

or investigation or any other discussions regarding donning and doffing prior to 2005.  Without

evidence of such participation, the Court finds that a search of ESI prior to 2005 is not likely to lead

to the discovery of relevant information.

### III.

Butterball proposes splitting the cost of the electronic discovery.  However, a court should

consider cost-shifting only when digital data is relatively inaccessible, such as in backup tapes.  *See*

*Opennheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358, 98 S. Ct. 2380, 2393, 57 L. Ed. 2d 253

(1978) ("[T]he presumption is that the responding party must bear the expense of complying with

discovery requests, but he may invoke the district court's discretion . . . to grant orders protecting

him from 'undue burden or expense . . . .'") In those cases, the court should consider: (1) the extent

to which the request is specifically tailored to discover relevant information; (2) the availability of such information from other sources; (3) the total cost of production, compared to the amount in controversy; (4) the total cost of production, compared to the resources available to each party; (5) the relative ability of each party to control costs and its incentive to do so; (6) the importance of the issues at stake; and (7) the relative benefits to the parties of obtaining the information. *Zubulake*, 217 F.R.D. at 322. Courts should not consider cost shifting when ESI is kept in an accessible format. *Id.* at 318. Here, the Court has not compelled the discovery of any ESI that is not readily accessible. As a result, cost-shifting is inappropriate.

## CONCLUSION

For the reasons stated above, plaintiffs' motion to compel is GRANTED IN PART and DENIED IN PART. Document #144.

IT IS SO ORDERED this 27th day of May, 2010.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE